**James P. ERET, Plaintiff,**

v.

**CONTINENTAL HOLDING, INC., f/k/a Continental Can Company, Inc., f/k/a Continental Group, et al., Defendants.**

**No. 92 C 4758.**

·United States District Court, N.D. Illinois, E.D.

Nov. 19, 1993.

---

John C. Ambrose, Ambrose & Cushing, P.C., Chicago, IL, for plaintiff.

Anne J. McClain, Stephen Ray Patton, Kirkland & Ellis, Chicago, IL, for defendants.

## MEMORANDUM OPINION AND ORDER

ALESIA, District Judge.

Plaintiff James P. Eret ("Eret") brings this two-count Amended Complaint against Continental Holding, Inc., f/k/a Continental Group, f/k/a Continental Can Company, Inc., CCC Salaried Pension Plan, Crown Beverage Packaging Inc. Salaried Pension Plan, and Peter Kiewit Sons' Inc., alleging violations under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1132, 1140. In his first count, plaintiff alleges that each of the named defendants violated Section 510 of ERISA, 29 U.S.C. § 1140, by transferring Eret to another plant to avoid pension liability. Amended Complaint, at ¶¶ 23, 24. In his second count, Eret claims that the General Pension Board's ("Pension Board") decision to deny full benefits to Eret was "arbitrary [and] capricious, not made in good faith," and "erroneous as a matter of law." Amended Complaint, at ¶ 29.

Defendants Continental Holding, Inc. and Peter Kiewit Sons', Inc. (collectively "defendants")[1] filed a motion to dismiss the counts

---

1. Eret's Amended Complaint does not make clear which of the named defendants he refers to at various points in the complaint. As the Report points out, the complaint appears to distinguish among the individual defendants in the specific allegations without explanation. For example, although Eret states that the term "Continental" collectively refers to all named defendants, including two pension plans, in ¶ 3 Eret later asserts that "Continental" is a corporation doing business in Illinois. Moreover, after defining "Pension Plan" as "Defendant, Continental's Pension Plan," and not as corresponding to a named defendant, Eret prays for relief against the "Pension Plan" in Count II. For the purposes of this opinion, we will adopt Eret's use of the word "Continental" when describing allegations in the Amended Complaint and thus this opinion affects all named defendants equally. If Eret chooses to refile this action, then the second amended complaint must specifically state which

against them. The motion was referred to Magistrate Judge Rosemond for a Report and Recommendation ("Report"). Magistrate Judge Rosemond entered his Report recommending that this court deny the motion to dismiss. The defendants subsequently submitted their objections to the Report, and Eret responded with memoranda in opposition to defendants' objections. These objections and responses are now before the court.

For the reasons set forth below, the court sustains the defendants' objections, and dismisses Counts I and II of plaintiff's Amended Complaint without prejudice.

## I. FACTS

From April 13, 1959 until January, 1986, defendant Continental employed plaintiff James P. Eret at Continental's O'Hare plant. In January 1986, Continental temporarily assigned Eret to its West Chicago plant, although Continental still technically classified Eret as an employee of the O'Hare plant. Continental usually gave its employees the opportunity to accept or reject a transfer but, in this instance, Continental transferred Eret without seeking Eret's consent. At some point in 1988, Continental made Eret's transfer to West Chicago permanent. At all times that Eret remained in Continental's employ, Eret participated in a pension plan offered by Continental to its employees ("Pension Plan").

In September 1988, Continental sold the West Chicago plant to Figgie International ("Figgie"). Eret continued to work for Figgie after the sale, and sometime during 1988 the O'Hare plant closed. Eret subsequently applied for severance pay and early retirement benefits pursuant to Continental's 75/80 provision of its Pension Plan. The General Pension Board denied Eret's request, which prompted Eret to file this action. In response, defendants filed a motion to dismiss both counts of Eret's Amended Complaint

pursuant to Federal Rule of Civil Procedure 12(b)(6).

In Count I, Eret alleges that Continental violated section 510 of ERISA because Continental transferred him to West Chicago "solely to avoid [pension liability under Continental pension plan's] 75/80 pension provision." Amended Complaint, at ¶ 24. Essentially, Eret alleges that he is due all benefits that he would have received if he were employed at the O'Hare plant when it shut down. Eret maintains that the transfer to West Chicago was discriminatory, evidenced in part by the fact that Continental did not transfer a fellow, better qualified employee who happened to be ineligible for 75/80 benefits in the event of a shutdown at the West Chicago plant. Eret contends that the West Chicago plant had "no real need for his services," and thus the permanent transfer was effectuated only to escape pension liability.[2] Amended Complaint, at ¶ 24.

Defendants moved to dismiss Count I pursuant to Federal Rule of Civil Procedure 12(b)(6), arguing that Eret had not alleged either discharge or constructive discharge, the only two causes of action recognized by Section 510. The Magistrate Judge recommended denying defendants' motion to dismiss Count I, reasoning that the legislative history of ERISA supports a more expansive reading of Section 510 than the restricted scope asserted by defendants.

In Count II, Eret asserts that the Pension Board's decision to deny Eret pension benefits pursuant to the plant shutdown policy was erroneous. Specifically, Eret claims that the Pension Board should have ruled that the sale of the West Chicago Plant was a shutdown which vested Eret's pension benefits. In his Report, the Magistrate Judge found that the Pension Plan was a document outside the pleadings and, as such, could not be considered on a motion to dismiss. Without the critical information contained in the Pension Plan, the Magistrate Judge concluded that the only proper course of action was to

---

defendants he refers to in order to conform to notice pleading under Rule 11.

**2.** Although Eret does not specifically allege constructive discharge in his Amended Complaint,

Eret maintains in later briefs that he has alleged facts sufficient to sustain a constructive discharge claim.

deny the defendants' motion to dismiss. In all other respects, the Magistrate Judge stated that the analysis regarding Count I also applied to Count II. Defendants objected to the Magistrate Judge's refusal to consider the Pension Plan, arguing that the court may properly consider the Pension Plan as part of the pleadings. Defendants contended that the Magistrate Judge should have reviewed the Pension Board's decision under the arbitrary and capricious standard and, viewed as such, the decision to deny Eret benefits was within its discretion. We will address each of defendants' objections to the Magistrate Judge's Report and to Eret's responses in turn.

## II. DISCUSSION

### A. Standard of Review

#### 1. Motion to Dismiss

In ruling upon a motion to dismiss, this court must accept as true all facts as alleged in the plaintiff's Amended Complaint, and draw all reasonable inferences favorable to the plaintiff. *Bowman v. City of Franklin*, 980 F.2d 1104, 1107 (7th Cir.1992), *cert. denied*, —— U.S. ——, 113 S.Ct. 2417, 124 L.Ed.2d 639 (1993). The motion should not be granted unless it is clear that plaintiffs cannot prove any set of facts consistent with the allegations which would entitle them to relief. *Gorski v. Troy*, 929 F.2d 1183, 1186 (7th Cir.1991) (quoting *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80 (1957)); *Hishon v. King & Spalding*, 467 U.S. 69, 73, 104 S.Ct. 2229, 2232, 81 L.Ed.2d 59 (1984). The court need not accept, however, legal conclusions either alleged or inferred from facts in the complaint. *Chawla v. Klapper*, 743 F.Supp. 1284, 1285 (N.D.Ill. 1990) (citing *Carl Sandburg Condominiums Ass'n No. 1 v. First Condominium Dev. Co.*, 758 F.2d 203, 207 (7th Cir.1985)).

#### 2. Magistrate Judge's Report and Recommendation

Pursuant to 28 U.S.C. § 636(b)(1), this court must make a *"de novo* determination of those portions of the report ... or recommendations to which objection is made." Therefore, this court will address defendants'

objections and, keeping in mind the standard when reviewing a motion to dismiss, the court will make a *de novo* determination as to each.

### B. The Pension Plan

As a preliminary matter, we address defendants' objection to the Magistrate Judge's refusal to consider the Pension Plan in considering defendants' motion to dismiss. Although Eret did not include the Pension Plan or any relevant language from it in his Amended Complaint, defendants attached a copy of the Pension Plan to their brief, and they now argue that the court may properly consider the relevant provisions of the Pension Plan.

Although courts are generally not to consider documents outside the pleadings under Federal Rule of Civil Procedure 12(b), Rule 10(c) provides that "[a] copy of any written instrument which is an exhibit to a pleading is a part thereof for all purposes." FED.R.CIV.P. 10(c). Rule 10(c), which is permissive in nature, means that although a plaintiff is not obligated to attach documents to the complaint, "a defendant may introduce certain pertinent documents if the plaintiff failed to do so." *Venture Assocs. Corp. v. Zenith Data Systems Corp.*, 987 F.2d 429, 431 (7th Cir.1993). A court may consider a document as a part of the pleadings if the plaintiff has referred to the document in his complaint and the document is central to the plaintiff's claim. *Id.* In the present case, the Pension Plan is undeniably at the core of Eret's cause of action, and Eret refers to the Plan repeatedly in his complaint. *See* Amended Complaint ¶¶ 2–8, 14, 17–24. Thus, this court will consider the Pension Plan in considering the adequacy of Eret's Amended Complaint.

The relevant provision of the Pension Plan, Section 5.03, provides:

(a) A member who has not reached his Normal Retirement Date but

(ii) who (A) shall have had at least 15 years of Continuous Service, (B) whose combined years of age and Continuous Service ... shall equal 80 or more, or shall equal 75 or more if he shall have attained

age 55 and (C) who is on layoff due to permanent plant shutdown or whose Continuous Service shall be broken as a result of layoff (other than due to permanent plant shutdown)....

shall be retired from service on an early retirement Pension on the first day of the calendar month after the General Pension Board receives his written application to retire.[3]

Pension Plan, at pp. 29–30. According to Eret's complaint, the Pension Plan also provided for an allowance in which an employee could automatically gain two years credit towards early retirement if the employee had a total of at least 78 years of age or service but less than 80 years. This "creep" provision allowed an employee in other respects eligible for early retirement to retire two years earlier than prescribed by the 75/80 provision of the Pension Plan.[4]

## C. *Count I*

Eret brings his cause of action under Count I pursuant to section 510 of ERISA, which provides:

It shall be unlawful for any person to discharge, fine, suspend, expel, discipline, or discriminate against a participant or beneficiary for exercising any right to which he is entitled under the provisions of an employee benefit plan ... or for the purpose of interfering with the attainment of any right to which such participant may become entitled under the plan....

29 U.S.C. § 1140. In his report, the Magistrate Judge found that ERISA's legislative history indicated that Section 510 "intended to prevent any employer interference with the attainment of pension or benefit rights." Report, at p. 10. Thus, the Magistrate Judge concluded that:

Here Eret has alleged that he was a member of a group of employees who would have been entitled to severance and early retirement benefits when the O'Hare plant closed. In order to avoid paying those benefits, Continental assigned him to another group where his employment would be continued. We think this states a *prima facie* case under § 1140.

*Id.* at p. 12. Defendants object to the Magistrate Judge's reasoning that ERISA prohibits acts other than discharge or constructive discharge. Since Eret's employment was continued after the transfer, defendants contend, Eret cannot show either discharge or constructive discharge, and accordingly, the court should dismiss Eret's complaint. Eret responds that Section 510 prohibits other types of improper employer activity, and in the alternative, Eret asserts that his allegations also support a constructive discharge claim.

### 1. *The Scope of ERISA*

■ Section 510 was designed to "prevent unscrupulous employers from discharging or harassing their employees in order to keep them from obtaining vested pension rights." *West v. Butler,* 621 F.2d 240, 245 (6th Cir.1980). Although the courts have not fully defined the parameters of ERISA, it is well established that "a fundamental prerequisite to a [Section] 510 action is an allegation that the employer-employee relationship ... was changed in some discriminatory or wrongful way." *Deeming v. American Standard, Inc.,* 905 F.2d 1124, 1127 (7th Cir.1990). Typically, a plaintiff alleges either discharge or constructive discharge to satisfy pleading requirements under Section 510. The Seventh Circuit has not specifically addressed, however, whether a plaintiff's cause of action is limited to such allegations, but recent

---

**3.** Although Eret and defendants characterize the benefits contained under this provision differently, both parties apparently agree that the only benefits at issue are 75/80 benefits and severance pay. Eret does not contend that his right to any of his "regular" pension benefits was harmed in any way. The document attached by Eret to his complaint further supports this conclusion. In the document, the Pension Board denies Eret's request for "severance and shutdown benefits."

**4.** As of January 1, 1988, while Eret was still an employee of the O'Hare plant, Eret had accumulated 77 years of age and service. He had 79 years of service amassed at the time the West Chicago plant was sold to Figgie. Under the Pension Plan's 75/80 provision, had Continental decided to retain Eret at the O'Hare plant instead of transferring him to West Chicago, Eret would have been eligible for early retirement when the O'Hare plant closed, due to the Pension Plan's "creep" provision.

cases suggest that ERISA's scope is restricted where the plaintiff's employment has been continuous and the benefits at issue are limited to layoff or severance benefits. *See Sallee v. Rexnord Corp.*, 985 F.2d 927 (7th Cir. 1993); *Varhola v. Doe*, 820 F.2d 809 (6th Cir.1987); *cf. Bogue v. Ampex Corp.*, 976 F.2d 1319, 1327 (9th Cir.1992) (noting that actual or constructive discharge *must* be alleged to survive a motion to dismiss).

In *Sallee*, the Seventh Circuit addressed the scope of Section 510 where the plaintiff does not allege discharge or constructive discharge. In that case, plaintiffs worked in a plant scheduled to be closed. *Sallee*, 985 F.2d at 928. According to the defendant employer's pension plan, employees were eligible for severance pay if they were employed by the defendant company on the day of termination. In light of their impending layoffs, plaintiffs located alternative employment. Although the plaintiffs' employer had negotiated termination dates with many of the other employees, the employer refused to accommodate the plaintiffs' requested termination dates. Plaintiffs then decided to quit the defendant's employ to begin their new jobs. *Id.* at 928. After the defendant denied plaintiffs severance benefits, the plaintiffs sued under Section 510, claiming that the company "wrongfully prevented them from participating in the plan." *Id.* at 929. Plaintiffs argued that this treatment was discriminatory under Section 510 because the employer granted other employees preferred termination dates, while plaintiffs were not similarly accommodated. The court rejected the plaintiffs' claim, finding, *inter alia*, that "while section [510] protects plan participants from discharge, suspension, and the like, it does not appear to protect them from continued employment." *Id.* at 929.

In *Varhola v. Doe*, 820 F.2d 809 (6th Cir. 1987), the Sixth Circuit held that an employer's decision to retain some employees while allowing others to retire with shutdown pensions does not give rise to an action under Section 510. *Id.* at 816–17. In *Varhola*, the employer provided a pension plan that allowed employees who met age and service criteria to retire in the event of a plant shutdown. Although the employer closed

down part of the plant and permitted certain eligible employees to retire, coke operations were continued at the plant. Plaintiffs, who were coke operators, remained employed at the plant. After the sale of the coke plant, plaintiffs were designated to continue working for the new employer, rather than to retire. Plaintiffs sued under Section 510, claiming that the employer interfered with their pension rights by denying early retirement to the plaintiffs, but granting it to other similarly situated employees. Noting that the employer's decision might not be fair, the court found that the legislative history revealed that Section 510's "prohibitions were aimed primarily at preventing unscrupulous employers from discharging or harassing their employees in order to keep them from obtaining vested pension rights." *Id.* at 816 (quotations omitted). Thus, the court affirmed the district court's ruling that there was no evidence of unlawful discrimination.

As viewed under *Sallee* and *Varhola*, a plaintiff does not state a cause of action where the employer's only alleged discrimination was retaining an employee under circumstances where the employee preferred to be terminated. Defendants contend that Eret's allegations amount to such a charge. Eret responds by asserting that discharge and constructive discharge are only two of the categories of impermissible behavior recognized by Section 510. Specifically, Eret alleges that fraudulent activity by the employer or threatening an employee with violence constitute a cause of action under Section 510. Although we agree with Eret that Section 510 encompasses situations involving fraud or violence, we find that these cases do not expand upon the general requirement of showing a "wrongful disruption of the employment relationship." Eret, therefore, is not relieved of his duty to allege a wrongful employer activity. Here, Eret has alleged only that Continental transferred him to keep him employed. This allegation is simply not the kind of disruption ERISA is designed to protect.

Further, we note that Eret has not alleged that any of his regular retirement benefits were harmed as a result of either Eret's transfer to the West Chicago plant or

the sale of the plant to Figgie. Defendants point out that Eret is currently receiving a pension from Continental. Moreover, Eret has not alleged that the sale to Figgie changed the nature of his employment in any way, as he states that "the exact date of completion of the contract [to sell the plant to Figgie] is unknown to the Plaintiff." Amended Complaint, at ¶ 13. In fact, the only apparent effect on Eret after the sale of the plant was a different signature on his paycheck. At most, therefore, the allegations show that defendants knew they would shut down the O'Hare plant and knew they would sell the West Chicago plant to Figgie. Knowing this, defendants intentionally transferred Eret to the West Chicago plant to avoid laying him off and paying him severance benefits, but also ensuring his continued employment and complete pension benefits with Figgie, the purchaser of the West Chicago plant. Even assuming all of this, plaintiff has not stated a cause of action because, as discussed, Section 510 does not require that, when a plant shuts down, every worker eligible for severance benefits be laid off in order to receive such benefits. It is well within an employer's spectrum of acceptable behavior to place such workers in similar employment positions, if available, as an alternative to laying them off.

Thus, this court agrees with defendants and concludes that Count I of Eret's Amended Complaint does not state a cause of action. Eret contends that Continental violated ERISA by transferring him to the West Chicago plant to avoid pension liability, and it follows that Eret contends that Continental's correct course of action was *not* to transfer him, but to lay him off. It unreasonably stretches the meaning of the relevant statutory language to suggest that protection of the employment relationship under ERISA means an employer must discharge an employee if doing so would make the employee eligible for severance or layoff benefits.

### 2. *Constructive Discharge*

█ Having analyzed the types of employer activity prohibited by ERISA, we now turn to Eret's alternative theory that he has stated facts in his complaint amounting to constructive discharge.[5] Defendants contend that Eret's allegations do not resemble a claim of constructive discharge as recognized by the courts.

Courts have found constructive discharge where "working conditions would have been so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign." *Lojek v. Thomas,* 716 F.2d 675, 681 (9th Cir.1983) (quoting *Nolan v. Cleland,* 686 F.2d 806, 813–14 (9th Cir.1982)). Courts have also found constructive discharge where the employer has demoted the employee and assigned him to entry level work to "cause [plaintiff] to terminate his employment before his pension rights vest." *Jess v. Pandick, Inc.,* 699 F.Supp. 698, 699 (N.D.Ill.1988).

With the above principles in mind, we agree with defendants that Eret's Amended Complaint does not support a claim of constructive discharge. Continental's only allegedly improper behavior in connection with Eret's working conditions was to transfer him to a plant where there was "no real need for his services." Amended Complaint, at ¶ 24. Eret does not allege that Continental demoted him or that his working conditions were made difficult. Moreover, Eret's Amended Complaint is based on the premise that Continental wanted Eret to *continue* working. To the contrary, a claim of constructive discharge alleges that the employer's behavior compelled the plaintiff to *stop* working. As such, Eret's claim of constructive discharge fails as a matter of law.

### D. *Count II*

In his Amended Complaint, Eret alleges that the Pension Board's decision to deny him full benefits pursuant to the 75/80 provision of the Pension Plan was arbitrary and capricious. The Magistrate Judge determined that it could not fully consider the Pension Board's decision because the Pen-

5. The Magistrate Judge did not address this question, since the Report found that Eret could sustain his cause of action under a "wrongful transfer" theory. Since this court has determined otherwise, we will proceed to the question of constructive discharge.

sion Plan was outside the pleadings. As stated above, this court finds that the Pension Plan is considered a part of the pleadings for the purposes of this motion. Thus, the court may properly consider the Pension Board's decision to not grant Eret benefits. Before specifically addressing the Pension Board's ruling, however, we first address the more fundamental question of whether Eret has a legal right to the benefits at issue, applying a *de novo* standard of review.

### 1. *Eret's Legal Right to the Benefits*

■ In his Amended Complaint, Eret contends that he is due benefits under the Pension Plan because the Pension Board should have treated the sale of the West Chicago plant as a shutdown. The 75/80 provision provides early retirement benefits to employees who are "on layoff due to permanent plant shutdown." Even a quick reading of this provision compels the conclusion that the Pension Board's interpretation of the word "shutdown" is irrelevant if Eret was not on "layoff." Eret apparently concedes that he suffered no loss of employment as a result of the sale to Figgie.

Discussing a fact pattern similar to this case, the Sixth Circuit has held that the "separation from one employer followed by immediate employment with a successor employer" because of the sale of a plant is not a layoff. *Rowe v. Allied Chemical Hourly Employees' Pension Plan,* 915 F.2d 266, 269 (6th Cir.1990); *see also Blank v. Bethlehem Steel Corp.,* 926 F.2d 1090, 1093–95 (11th Cir.), *cert. denied,* — U.S. —, 112 S.Ct. 372, 116 L.Ed.2d 324 (1991); *Kotrosits v. GATX Corp. Non–Contributory Pension Plan for Salaried Employees,* 970 F.2d 1165, 1176–77 (3d Cir.), *cert. denied,* — U.S. —, 113 S.Ct. 657, 121 L.Ed.2d 583 (1992); *cf. Fought v. Evans Products Co. Racine Pension Plan Agreement,* 966 F.2d 304, 307 (7th Cir.1992) (stating that "[e]mployees let go on the sale of an entire plant *are not laid off.* . . ."). Indeed, courts have found that "with respect to employees who continue comparable employment with the purchaser of the business, supplementing their salary checks from the purchaser with severance payments from the prior employer would bestow a 'windfall, because it would award severance pay to persons who never changed their jobs and were never out of work.'" *Reichelt v. Emhart Corp.,* 921 F.2d 425, 430 (2d Cir.1990) (quoting *Sejman v. Warner–Lambert Co.,* 889 F.2d 1346, 1350 (4th Cir. 1989), *cert. denied,* 498 U.S. 810, 111 S.Ct. 43, 112 L.Ed.2d 19 (1990)).

In *Sly v. P.R. Mallory & Co.,* 712 F.2d 1209 (7th Cir.1983), former employees sued to recover severance and other benefits when the company they worked for was sold, although they continued working in the same job for the new owner. The Seventh Circuit held that the district court correctly ruled that the employees were not entitled to severance pay, because they were immediately hired by the company's new owner. The court quoted the "well considered" District Court opinion that "[t]o award severance benefits under these facts would result in a windfall to the employees who retained their positions with the purchaser of the going concern, which was clearly not the intention or goal of . . . ERISA." *Id.* at 1211.

In the present case, Eret has not asserted any facts from which this court could conclude that Eret was on "layoff," thus qualifying him for 75/80 benefits. We find that granting Eret layoff benefits where he has suffered no loss of employment would bestow a windfall to Eret—a result at odds with the purposes and aims of ERISA. Thus, Eret has failed to allege any facts pursuant to which he could prove that he has any legal right to benefits.

### 2. *The Ruling of the Pension Board*

■ Even if this court could find that Eret had a legal right to the 75/80 benefits, the allegations of the Complaint tend to demonstrate that it was within the Pension Board's discretion to determine that the sale to Figgie did not vest Eret's rights under the 75/80 plan. Under *Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989), where a "benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan," the court should apply a deferential standard of review to the administrator's rul-

ing. *Id.* at 115, 109 S.Ct. at 956–57. The Pension Plan in this case gives the Pension Board "sole discretion, to interpret all the terms of the plan, including, but not limited to, the terms for determining eligibility for benefits ...". Pension Plan, at p. 54. Thus, the Pension Plan gave the Pension Board broad discretion over pension eligibility, and the court's role "is limited to determining whether the contested interpretation was made rationally and in good faith." *Blank v. Bethlehem Steel Corp.* 926 F.2d 1090, 1093 (11th Cir.), *cert. denied,* — U.S. ——, 112 S.Ct. 372, 116 L.Ed.2d 324 (1991).

 Eret apparently asserts two theories to support the contention that the Pension Board's decision was erroneous. First, Eret asserts that the Pension Board should have classified him as "on layoff." As the discussion above demonstrates, however, plaintiff has alleged no facts supporting his theory that he was on layoff or that it was unreasonable for the Pension Board to so determine. Second, Eret claims that the Pension Board should have deemed the sale of the West Chicago plant a "shutdown" under the 75/80 provision. In construing ERISA-governed policy, we refer to federal common law rules of contract interpretation. *Hammond v. Fidelity and Guaranty Life Ins. Co.,* 965 F.2d 428, 430 (7th Cir.1992). Under this method of analysis, terms are interpreted "in an ordinary and popular sense as would a person of average intelligence and experience." *Id.* Here, the word "shutdown" is not ambiguous and commonly means "the cessation or suspension of an activity or function: usually stoppage of work in a factory ...". WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY (1986). In contrast, a "sale" does not necessarily involve a cessation of activity, and Eret has certainly not alleged that operations at the West Chicago Plant were discontinued in any way. Thus, the Pension Board could properly find that the sale to Figgie did not trigger eligibility for 75/80 benefits. Accordingly, Eret has alleged no facts to support his claim that the Pension Board acted unreasonably or in bad faith in finding that Eret was not entitled to 75/80 benefits under the terms of the Pension Plan. Thus, for the reasons discussed above, and drawing all inferences in favor of plaintiff, we do not believe that plaintiff can prove any set of facts, consistent with the allegations, that the Pension Board's interpretation of Eret's employment status was unreasonable and, thus, invalid under ERISA.

### III. *CONCLUSION*

For the foregoing reasons, defendants' objections to the Magistrate Judge's Report are sustained. Counts I and II are dismissed without prejudice for failure to state a claim upon which relief may be granted. Although Eret has already filed an Amended Complaint, he may within twenty (20) days of his receipt of this Memorandum Opinion and Order amend his Amended Complaint to allege facts sufficient to assert a cause of action consistent with this opinion.