**Vincent PELOSI, Plaintiff,**

v.

**SCHWAB CAPITAL MARKETS, L.P. (a/k/a UBS Capital Markets), Charles Schwab Corporation, the Charles Schwab Severance Pay Plan and UBS Securities LLC, Defendants.**

No. 05 Civ. 9108(VM).

United States District Court, S.D. New York.

Nov. 17, 2006.

Neal Brickman, Lead Attorney, Law Office of Neal Brickman, New York, NY for plaintiff, Vincent Pelosi.

Eugene Scalia, Matthew R. Estabrook, Lead Attorneys, Gibson, Dunn & Crutcher LLP, Washington, DC, Prasanth Rao Akkapeddi, Lead Attorney, Gibson, Dunn & Crutcher, LLP, New York, NY, for defendants, Schwab Capital Markets L.P., UBS Securities LLC.

Gary Herbert Glaser, Lead Attorney, Seyfarth Shaw LLP, New York, NY, for defendants, Charles Schwab Corp., and Charles Schwab Severance Pay Plan.

## *DECISION AND ORDER*

MARRERO, District Judge.

Plaintiff Vincent Pelosi ("Pelosi") filed this action seeking redress for defendants' alleged denial of benefits and alleged interference with Pelosi's rights under the Charles Schwab Severance Pay Plan (the "Plan"), which is regulated by the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq.* The amended complaint alleges four causes of action: (1) discrimination and interference with Pelosi's right to severance; (2) wrongful denial of Pelosi's claim for benefits; (3) tortious interference with

a contractual relationship, or alternatively, with prospective economic advantage; and (4) breach of fiduciary duty. Two separate motions to dismiss have been filed pursuant to Fed.R.Civ.P. 12(b)(6): one by UBS Capital Markets, L.P. ("UBSCM"), formerly known as Schwab Capital Markets, L.P. ("SCM"), and UBS Securities LLC ("UBS") (collectively the "UBS Defendants"); the other by the Charles Schwab Corporation ("Schwab") and the Plan as a separate entity[1] (collectively the "Schwab Defendants").

For the reasons set forth below, the motions[2] of the Schwab Defendants and UBS Defendants (collectively "Defendants") are granted in part and denied in part. They are granted with respect to Pelosi's first, third and fourth causes of action for discrimination, tortious interference and breach of fiduciary duty, and denied with respect to his second causes of action for wrongful denial of benefits.

## I. BACKGROUND[3]

In ruling on Defendants' motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), the Court accepts the following facts, which are alleged in Pelosi's amended complaint, as true for this purpose. *See Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir.2002) (*citing Gregory v. Daly*, 243 F.3d 687, 691 (2d Cir.2001)).

In mid–2004, Schwab announced its intention to sell its wholly owned subsidiary,

1. Pelosi contends that as an unfunded plan, it is unclear whether the Plan can be considered a separate "entity," nevertheless it is named as a defendant "out of an abundance of caution." (*See* Plaintiff's memorandum of Law in Opposition to Defendants' Motions to Dismiss the First Amended Complaint, dated May 31, 2006 ("Pelosi Opp."), at 3 n. 1.).

2. Pelosi's second cause of action, wrongful denial of benefits, is asserted only against the

Schwab Defendants; his third cause of action, tortious interference, is asserted only against UBS.

3. The factual recitation below derives from Pelosi's amended complaint, dated Feb. 24, 2006 ("Compl."). Except where quoted or otherwise specifically cited, no further reference will be made to this document.

SCM, to UBS. Pelosi was employed by SCM since 1990 and at the time of the announced sale Pelosi was a senior vice-president of SCM working in Schwab's Jersey City, New Jersey office with an anticipated total annual compensation of approximately $1.4 million.

Under the Plan, if as a result of the sale of SCM, Pelosi suffered a "Job Elimination," he would be entitled to severance benefits. As alleged by Pelosi, as a result of the sale he would fall within the definition of "Job Elimination" unless he was offered comparable employment by UBS. UBS did in fact offer him a post-closing position with UBSCM, the successor entity to SCM. Pelosi alleges this post-transaction position was in no way comparable to his SCM position. Pelosi alleges that the UBSCM position guaranteed him only 10 percent of his SCM salary, required him to commit to working in Stanford, Connecticut, and contained a restrictive non-compete provision which would limit his employment options if terminated by UBSCM.

Pelosi alleges that in order to avoid paying his substantial severance, Schwab, SCM and UBS conspired to offer him what was clearly a non-comparable position. Further, other similarly situated SCM employees were given informal "soft" offers from UBS and in the event those "soft" offers were rejected, UBS refrained from making formal offers. As a result, the other allegedly preferentially treated employees were given full severance under the Plan while Pelosi was denied any such benefits.

After receiving the offer from UBS, Pelosi notified Schwab that he believed the offer to be non-comparable and inquired about his severance benefits. According to Pelosi, he was then informed that "unless he immediately accepted the UBS offer, Schwab and UBS would deem Mr. Pelosi to have accepted the UBS offer and then terminate his employment with UBS for an alleged failure to report to work." (Compl. at ¶ 23). Moreover, Pelosi alleges that Schwab and UBS threatened that if he did not accept the offer they would report on his "NASD Form U–5" that he was terminated "for cause," which would hinder Pelosi's ability to find other employment. (*Id.* at ¶ 24.) Based on Defendants' actions, Pelosi considered his employment with SCM to be terminated. Pelosi formally made a claim for benefits under the Plan, which was denied, as was his administrative appeal.

■ Of particular relevance to Pelosi's claims here is the meaning of "Job Elimination," which is defined in Article 2.H of the Plan,[4] in pertinent part, as:

[A]n involuntary termination of employment on account of changes in the Company's operations or organization, as determined by the Administrator in its sole discretion. Notwithstanding anything to the contrary contained herein, a Job Elimination shall not result (i) from an Employee's termination of employment on account of voluntary resignation, retirement or death prior to notice

---

4. While not attached to the amended complaint, Pelosi cites to the Plan numerous times therein. (*See* Compl. ¶ 15, 31–33.) A copy was submitted by the Schwab Defendants in conjunction with its motion to dismiss. In deciding a Rule 12(b)(6) motion, courts may consider "any written instrument attached to [the complaint] as an exhibit or any statements or documents incorporated in it by reference ... and documents that the plaintiffs either possessed or knew about and upon which they relied in bringing the suit." *Rothman v. Gregor*, 220 F.3d 81, 99–89 (2d Cir. 2000) (citations omitted); *see also Cosmas v. Hassett*, 886 F.2d 8, 13 (2d Cir.1989). Accordingly, the Court may consider the Plan for the purposes of deciding this motion.

to the Employee of eligibility for Severance Benefits due to a Job Elimination; (ii) if the Company or any successor employer has offered the Employee a "Comparable Position" (the administrator shall have the sole discretionary authority to determine whether a position is a "Comparable Position" under this paragraph taking into account such factors as it deems appropriate including without limitation the similarity of duties, similarity of exempt or nonexempt status, salary range and any increase in the commuting distance to the employee's principal place of employment); ... (v) where, in connection with a merger, acquisition, spin-off, stock sale, sale of assets or portions of a business, or any other corporate transaction (a "Corporate Transaction"), an Employee is employed in the same or a substantially similar position at the closing of the Corporate Transaction or the Employee is offered a "Comparable Position" (as defined above).

In addition to this provision, the Schwab Defendants also point to Article 2.O of the Plan which defines what constitutes a "Participating Company" in the Plan. Article 2.O expressly states that "no benefits shall be payable under the Plan on account of any employment termination (actual or constructive) that occurs on or after the closing" of a Corporate Transaction. The Schwab Defendants emphasize that Pelosi was not terminated prior to the closing. According to Schwab, Pelosi's termination did not occur till after he failed to report to work at UBSCM, and thus, upon closing, Pelosi no longer worked for a "Participating Company" and had no right to make a claim for benefits under the Plan.

## II. DISCUSSION

### A. STANDARD OF REVIEW

In considering a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), the Court construes the complaint liberally, "accepting all factual allegations in the complaint as true, and drawing all reasonable inferences in the plaintiff's favor." *Chambers*, 282 F.3d at 152. However, mere "conclusions of law or unwarranted deductions of fact" need not be accepted as true. *First Nationwide Bank v. Gelt Funding Corp.*, 27 F.3d 763, 771 (2d Cir.1994) (quotation marks and citation omitted). The Court should not dismiss a complaint for failure to state a claim "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957).

### B. RECOVERY OF BENEFITS PURSUANT TO ERISA § 502(a)(1)(B)

■ Pelosi contends that the Schwab Defendants wrongfully denied his claim for severance, in violation of ERISA § 502(a)(1)(B), which expressly allows a participant or beneficiary of the plan to bring a civil action "to recover benefits due to him under the plan...." 29 U.S.C. § 1132(a)(1)(B). To maintain a claim pursuant to ERISA § 502(a)(1)(B), a plaintiff must demonstrate that the employee benefit plan in question is a plan covered by ERISA, that he is a participant in or beneficiary of the plan, and that he exhausted administrative remedies. *See Harrison v. Metropolitan Life Insurance*, 417 F.Supp.2d 424, 434 (S.D.N.Y.2006). Pelosi sufficiently alleges these initial requirements.

#### 1. Standard of Review of ERISA Plan Administrator's Decision

■ A denial of benefits challenged under ERISA Section 502(a)(1)(B) "is to be reviewed under a *de novo* standard unless the benefit plan gives the adminis-

trator ... discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 115, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989). If the plan grants discretionary authority to the Plan administrator, the administrator's determination should not be overturned unless it is arbitrary and capricious or erroneous as a matter of law. *See id.* It appears undisputed, and a review of the Plan confirms, that the administrator did have discretionary authority under the Plan. Pelosi, however, argues that a *de novo* review is required because the Plan administrator was operating under a conflict of interest. If the administrator was influenced by a conflict of interest, "the deference otherwise accorded the administrator's decision drops away and the court interprets the plan *de novo.*" *Sullivan v. LTV Aerospace & Defense Co.,* 82 F.3d 1251, 1256 (2d Cir.1996).

■ The amended complaint alleges that the Schwab Defendants' conflict of interest arose out of its conspiracy with UBS. (*See* Compl. ¶ 48.) Pelosi contends there was a clear conflict between the Schwab Defendants' role as administrator and its obligations under its agreement with UBS as seller. (*See* Pelosi Opp. at 17.) At this point, absent any discovery, the Court cannot determine whether there is any merit to Pelosi's allegations of a conflict. Thus, "[s]ince the proper analysis and standard of review will turn on [Pelosi's] ability to demonstrate that a conflict of interest influenced Defendants' decision-making, the Court will not be able to determine the proper analysis and standard of review until discovery has been completed and any evidence that a conflict of interest influenced decision-making has been submitted." *Harrison,* 417 F.Supp.2d at 436 (internal citations omitted); *see also Connell v. The Guardian*

*Life Insurance Co. of America Severance Plan,* No. 02 Civ. 7522, 2003 WL 21459563, at *2 (S.D.N.Y. June 24, 2003).

However, even if the Court were to conclude that the Plan administrator's determination that Pelosi was not eligible for severance benefits should be reviewed under the more deferential arbitrary and capricious standard, as discussed below, Pelosi sufficiently states a claim under ERISA § 502(a)(1)(B).

### 2. Job Elimination under the Plan

Pelosi alleges that he was not offered comparable employment and that under the plain language of the Plan, he therefore suffered a "Job Elimination" and was entitled to severance pay. The Schwab Defendants arguments in support of the Plan administrator's decision are all based on the premise that Pelosi was not involuntarily terminated, but remained in his position through the Corporate Transaction and then voluntarily terminated his employment post-closing by failing to report to UBSCM. Thus, to the extent Article 2.H applies to Pelosi, the relevant section is 2.H.(i), which precludes a finding of a "Job Elimination" in the event of a voluntary resignation. Further, under Article 2.0, since Pelosi's termination occurred after the Corporate Transaction, he is clearly precluded from receiving benefits based on the plain language of the Plan which limits Plan coverage to a "Participating Company."

If Pelosi resigned voluntarily, then he would clearly be ineligible for benefits under the Plan. *See Criscuolo v. Joseph Seagram & Sons, Inc.,* No. 02 Civ. 1302, 2003 WL 22415753, at *7 (S.D.N.Y. Oct. 21, 2003) (declining to find an "involuntary termination" under severance plan where plaintiff left for other employment during pendency of corporate sale rather than accept offer with purchaser that he

deemed non-comparable). Pelosi's complaint, however, alleges that after receiving the non-comparable offer and being advised that if he did not accept the offer he would be considered terminated for cause, he "considered his employment with Schwab to have been terminated." (Compl.¶ 30.) If the UBSCM offer was so materially inferior to his SCM position that it could not be considered a "Comparable Position" or the "same or a substantially similar position," as per Article 2.H., Pelosi may have been "involuntarily terminated" as of the point in time he was told he had to accept the position. Thus, if the record indicates that the terms and conditions of the UBSCM offer were in no way comparable to his SCM position, it may substantially undercut the reasonableness of the Plan administrator's determination that Pelosi was offered continued employment and was thus ineligible for benefits.

In *Boss v. Advanstar Communications, Inc.*, 911 F.Supp. 109, 112 (S.D.N.Y. 1995), a case with analogous facts, the plaintiff claimed that her job after a corporate sale was not comparable. The court, interpreting a severance plan which precluded severance "if employee is offered continued employment by the buyer," held that "what was reasonably intended by the plan's language" was that the employee was entitled to severance "unless the nature, terms and conditions of employment she was offered by [her new employer], taken as a whole, were reasonably comparable to those of her employment ... immediately prior to the sale." *Id.* While the court, on defendant's summary judgment motion, deemed the post-transaction position to be comparable, it rejected defendant's view that plaintiff was not entitled to severance so long as defendant offered her *any* employment, and noted that even though the language of the plan did not specify that the "continued employment"

be comparable, such a requirement "is the only view of the language that accords with common sense." *Id.* at 111. Here, the language of the Plan specifically defines a "Comparable Position," and common sense would dictate that if Pelosi was not offered a comparable position (or "the same or a substantially similar position"), he should fall within the definition of "Job Elimination" under the Plan. To credit the Schwab Defendants reading of the Plan would allow them to deny an employee severance benefits in connection with a Corporate Transaction under any circumstances in which that employee did not want to accept the post-closing job offer, "even if offered occasional employment by the new owner as a janitor at the minimum wage." *Id.* Such a reading of the Plan would clearly defeat its intended purpose.

Under the arbitrary and capricious standard, "a denial of benefits may be overturned only if the decision was without reasons, unsupported by substantial evidence or erroneous as a matter of law." *Harrison*, 417 F.Supp.2d at 436. If Pelosi can provide substantial evidence in support of his allegation that the UBSCM offer was materially non-comparable, Pelosi may be able to demonstrate that the Plan administrator's decision was without reason or otherwise unwarranted. Therefore, the Court denies the Schwab Defendant's motion to dismiss Pelosi's second cause of action seeking recovery of benefits pursuant to ERISA § 502(a)(1)(B).

## C. *DISCRIMINATION UNDER ERISA SECTION 510*

Pelosi's first cause of action alleges that Schwab, SCM (now UBSCM) and UBS violated ERISA § 510, which makes it "unlawful for any person to discharge ... or discriminate against a participant or beneficiary for exercising any right to which he is entitled under the

provisions of an employee benefit plan." 29 U.S.C. § 1140. The Second Circuit has stated that ERISA § 510 "was designed primarily to prevent unscrupulous employers from discharging or harassing their employees in order to keep them from obtaining vested pension rights." *Dister v. Cont'l Group, Inc.*, 859 F.2d 1108, 1111 (2d Cir.1988).[5]

### 1. Whether Defendant's Act Could Constitute Discrimination under ERISA § 510

Defendants argue that based on the facts alleged in the complaint, Pelosi cannot state a claim under ERISA § 510 because he was offered continued employment. Defendants point to case law interpretation stating that ERISA § 510 "is designed to protect the employment relationship that gives rise to an individual's benefit rights, not to create an action for 'wrongfully withheld benefits,' which is covered by [ERISA § 502(a)(1)]." *Blake v. Bank of New York*, No. 90 Civ. 4202, 1992 WL 183632, at *3 (S.D.N.Y. July 23, 1992) (*citing Fuchs v. Lifetime Doors, Inc.*, 939 F.2d 1275, 1279 (5th Cir.1991)). Defendants stress that neither Schwab, SCM, UBSCM or UBS proactively terminated the employment relationship, that Pelosi was offered continued employment, and that Pelosi was only terminated in response to his voluntary decision not to report to work at UBSCM. Generally, an offer of continued employment, even if deemed inadequate, and which would preclude severance rights, is incompatible with a discrimination claim under ERISA § 510. *See Blessing v. J.P. Morgan Chase & Co.*, 394 F.Supp.2d 569, 583 (S.D.N.Y.2005) ("This Court will not hold that an offer of employment, regardless of its nature, is an act of discrimination in violation of § 510 simply because it prevents the employee from attaining severance pay."); *see also Stout v. Bethlehem Steel Corp.*, 957 F.Supp. 673, 694 (E.D.Pa.1997) ("Offering a job, or the chance to continue employment, has never been prohibited conduct, and it would be a ludicrous distortion of ERISA to make it so."); *Eret v. Continental Holding*, 838 F.Supp. 358, 364 (N.D.Ill.1993) (plaintiff "has alleged only that Continental transferred him to keep him employed. This allegation is simply not the kind of disruption ERISA is designed to protect."). Defendants argue that allowing Pelosi's claim to proceed turns ERISA § 510 on its head in that Schwab and SCM are potentially liable only because they chose not to fire Pelosi and UBS is potentially liable only because it chose to offer Pelosi a job.

While "there may be a set of facts under which the position offered to the eligible employee will amount to discrimination or even a constructive discharge," *Blessing*,

---

**5.** In *Dister*, the Second Circuit extended the burden shifting framework enunciated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–05, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), to discrimination claims under ERISA § 510. To establish a prima facie case of discrimination, plaintiff must demonstrate that (1) he belonged to a group protected by ERISA § 510, (2) he was qualified for his position, and (3) he was discharged or denied employment under circumstances that give rise to an inference of discrimination. *See Dister*, 859 F.2d at 114–15. In the context of the pleading standards necessary to survive a motion to dismiss, however, plaintiff need not prove his prima facie case, but merely "give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 512, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002) (internal citations omitted) (holding that plaintiff does not have to prove prima facie case in discrimination case to survive motion to dismiss); *see also Blessing v. J.P. Morgan Chase & Co.*, No. 02 Civ. 3874, 2003 WL 470338, at *3 (S.D.N.Y. Feb.24, 2004).

394 F.Supp.2d at 584, it may stretch ERISA § 510 too far to hold that the UBSCM job offer, even if deemed unacceptable, can constitute discrimination. The Court need not decide, however, whether the facts alleged in the Complaint can sustain a ERISA § 510 claim, as the claim must be dismissed because it seeks relief not afforded by ERISA.

### 2. Relief Sought Is Unavailable under ERISA § 510

■ Pelosi seeks "the payment of compensation of at least equal to an additional 12–months severance pay, plus COBRA premium payments and other benefits," as redress for Defendants' alleged discrimination. (Compl.¶ 46.) ERISA § 502 is the "Civil Enforcement" provision of the statute, and as discussed above Pelosi has properly alleged a cause of action to recover benefits pursuant ERISA § 502(a)(1)(B). Presumably in an effort to differentiate the claims, with respect to his ERISA § 510 discrimination claim, Pelosi seeks "equitable enforcement of the plan pursuant to § 502(a)(3) of ERISA." (Id.)

■ ERISA § 502(a)(3) allows a plan participant "to obtain other appropriate equitable relief" to enforce any provisions of the ERISA statute, and it is "the usual enforcement provision for an alleged violation of § 510." DeSimone v. Transprint USA, Inc., No. 94 Civ. 3130, 1996 WL 209951, at *3 (S.D.N.Y. April 29, 1996). A plaintiff "may bring a claim under both [§ 502(a)(1)(B) ] and [§ 502(a)(3) ] only as long as [he] seeks equitable relief on [his § 502(a)(3) ] claim." Del Greco v.

CVS Corp., 337 F.Supp.2d 475, 487 (S.D.N.Y.2004). Because the relief Pelosi seeks in connection with his ERISA § 510 claim is not equitable, this claim must be dismissed.

Pelosi argues that he seeks a viable equitable remedy, relying on Strom v. Goldman, Sachs & Co., 202 F.3d 138, 144–45 (2d Cir.1999) (holding that although strictly monetary, the recovery of proceeds that plaintiff would have received but for her late husband's employer's breach of fiduciary duty in denying benefits, was a viable "make whole" equitable remedy under § 502(a)(3)). Pelosi argues that the relief sought can be properly characterized as restitution, an historically equitable remedy. The Supreme Court, however, in Great–West Life & Annuity Insurance Co. v. Knudson, 534 U.S. 204, 214, 122 S.Ct. 708, 151 L.Ed.2d 635 (2002), held that "for restitution to lie in equity, the action generally must seek not to impose personal liability on the defendant, but to restore to the plaintiff particular funds or property in the defendant's possession." In contrast, "almost invariably … suits seeking … to compel the defendant to pay a sum of money to the plaintiff are suits 'for money damages,' as that phrase has traditionally been applied, since they seek no more than compensation for loss resulting from the defendant's breach of a legal duty." Id. at 210, 122 S.Ct. 708.

Pelosi's claim is clearly one seeking money damages for the benefits he believes were improperly withheld in violation of Defendants' legal duties to him. Under Great–West Life,[6] Pelosi's ERISA

---

6. The Supreme Court's holding in Great–West Life clearly limits the applicability, if not directly abrogates, Strom. See Pereira v. Farace, 413 F.3d 330, 339 (2d Cir.2005) (noting that the reasoning of Great–West Life "cuts across the grain of Strom," and that "several courts have already agreed that Great–West has overruled … Strom."); Auqienello v. Coast-to-Coast Financial Corp., No. 01 Civ. 11608, 2002 WL 1822926, at *5–6 (S.D.N.Y. Aug.7, 2002) ("there is reason to believe Great–West Life repudiated the Second Circuit's reasoning in [Strom ], … [and] makes it difficult to conceive of the relief sought by plaintiffs

§ 510 claim seeks precisely the type of remedy the Supreme Court rejected as impermissible under ERISA § 502(a)(3). *See De Pace v. Matsushita Electric Corp. of America*, 257 F.Supp.2d 543, 563 (E.D.N.Y.2003) (holding plaintiff's requested remedy of compensatory damages, front pay, and benefits, while clearly "the type of 'make-whole' remedy envisioned by *Strom*," was nonetheless foreclosed by the Supreme Court's subsequent reading of ERISA § 502(a)(3)); *see also Nicolaou v. Horizon Media, Inc.*, No. 01 Civ. 0785, 2003 WL 22208356, at *2 (S.D.N.Y. Sept.23, 2003) (where plaintiff's ERISA § 510 claim "did not seek reinstatement or any other form of equitable relief, but rather seeks only lost wages and other money damages," the court held that "[a]lthough previous Second Circuit precedent was to the contrary, *see, e.g.,* [*Strom* ], the Supreme Court in *Great–West Life* denied that back pay is a form of equitable relief, stating instead that back pay may be part of an equitable remedy that includes the hiring and reinstatement of employees, but is not an equitable remedy in itself.").

*Great–West Life* involved a claim for funds not in the possession of the defendant, further undercutting the argument that the plaintiff sought equitable restitution of funds wrongfully held by defendant. *See Great–West Life*, 534 U.S. at 213–14, 122 S.Ct. 708. Here, Pelosi himself notes that he seeks monies from an "unfunded Plan." (Pelosi Opp., at 3 n. 1.) The Plan is clearly not a constructive trust holding particular funds Pelosi himself contributed

to it. Moreover, with respect to UBS, it cannot possibly be said that it holds Pelosi's funds or property. Even if Pelosi "may argue that the specific, identifiable property [he] seek[s] is in the hands of [Schwab] … this distinction does little to overcome the fact that plaintiff's claim is essentially one for money damages as a result of defendant's breach of a legal duty." *De Pace*, 257 F.Supp.2d at 565.

Although characterized as "equitable enforcement," Pelosi seeks identical relief for his discrimination claim as for his wrongful denial of benefits pursuant to ERISA § 502(a)(1)(B). Both causes of action allege the same conduct (illusory offer of continued employment to avoid paying severance) and seek the same remedy (the 12 months of pay Pelosi would have received if found eligible for severance, plus interest and COBRA payments). Pelosi "can label these claims whatever [he] likes, but they merely duplicate [his] claim for" denied benefits under 502(a)(1)(B). *Del Greco*, 337 F.Supp.2d at 487. ERISA § 502(a)(3) "acts as a safety net, offering appropriate equitable relief for injuries caused by violations of [ERISA] that § 502 does not elsewhere adequately remedy." *Varity Corp. v. Howe*, 516 U.S. 489, 512, 116 S.Ct. 1065, 134 L.Ed.2d 130 (1996). Where adequate relief exists for a beneficiary's injuries under other ERISA provisions, there is generally no need for "further equitable relief" under ERISA § 502(a)(3). *Id.* at 515, 116 S.Ct. 1065. Here, as adequate relief is available to Pelosi under 502(a)(1)(B),[7] and as the relief

(principally monetary damages) as a form traditionally available in equity").

**7.** Pelosi's claim pursuant to 502(a)(1)(B) is asserted only against the Schwab Defendants, thus Pelosi could argue that adequate relief against UBS does not otherwise exist. Leaving aside that Pelosi's ERISA § 510 claim against UBS is tenuous at best, even if Pelosi

could compellingly argue that Congress would "have wanted to provide recourse in federal court for the Plan violation" alleged against UBS, the Supreme Court makes clear that the language of the statute controls and the courts must limit the available relief based on the plain language of the statute "devoid of reason and effect." *Great–West Life*, 534 U.S. at 217–218, 122 S.Ct. 708.

sought pursuant to Pelosi's § 510 claim is duplicative, this claim is dismissed.

## D. *BREACH OF FIDUCIARY DUTY*

Pelosi's fourth cause of action asserts a breach of fiduciary duty claim against Defendants, contending that each defendant owed Pelosi a fiduciary duty and that this duty was breached based on the conduct alleged.

 While the Complaint does not specifically assert the breach of fiduciary duty claim under ERISA, to the extent Pelosi may intend to assert this claim under state statutory or common law, the claim is preempted by ERISA § 514. *See* 29 U.S.C. 1144(a) (the ERISA statute's provisions "supersede any and all laws insofar as they may now or hereafter relate to any employee benefit plan."); *see also Harrsion,* 417 F.Supp.2d at 431 ("ERISA's civil enforcement remedies are intended to be the exclusive remedies for enforcing rights in ERISA-governed plans.").

 While ERISA § 502(a)(2) allows a fiduciary to bring a claim for appropriate relief, such a claim "must be brought in a representative capacity on behalf of the plan as a whole." *Mead v. Arthur Andersen, LLP,* 309 F.Supp.2d 596, 597 (S.D.N.Y.2004). As the benefits Pelosi is seeking to recover are only those he is entitled to as an individual, he cannot proceed under § 502(a)(2). *Id.* Thus, he is limited to ERISA § 502(a)(3).

The breach of fiduciary duty claim alleges the same misconduct and seeks the same remedy as Pelosi's other ERISA claims. As with his ERISA § 510 claim, Pelosi does not seek injunctive relief, but merely what he characterizes as restitution. While "it is appropriate to allow plaintiffs to include a § 502(a)(3) claim which is distinct from a § 502(a)(1) claim[,] it is inappropriate to include a § 502(a)(3)

claim which, as here, merely duplicates the § 502(a)(1) claim." *Id.* at 598.

The amended complaint alleges that Pelosi was wronged by Defendants and alternatively asserts the wrong was an improper denial of benefits under the contract, discrimination and/or, a breach of fiduciary duty. To properly apply the doctrine of *Great–West Life,* however, the Court must focus on the "nature of the relief sought, not the theory supporting that relief." *Id.* at 599. As the Second Circuit recently stated, "[w]hile the plaintiffs seek to expand the nature of their claim by couching it in equitable terms to allow relief under § 502(a)(3), the gravamen of this action remains a claim for monetary compensation and that, above all else, dictates the relief available." *Frommert v. Conkright,* 433 F.3d 254, 270 (2d Cir.2006).

 The Court notes that while the Second Circuit in *Frommert* upheld dismissal of the § 502(a)(3) claim to the extent it sought monetary damages for the alleged breach of an ERISA plan, it reversed the district court's dismissal of a § 502(a)(3) claim for breach of fiduciary duty based on a different set of factual allegations asserting misrepresentations of the plan terms. *See id.* at 272. Here, however, Pelosi does not allege facts and conduct with respect to his fiduciary duty claim that are in any way different from the allegations supporting his other ERISA causes of actions. Consequently, the Court finds in this action there is no "appropriate equitable relief" necessary to remedy the harm alleged that is not adequately addressed by the relief available under § 502(a)(1)(B). *See id.*

For the above reasons, Pelosi's breach of fiduciary duty claim is dismissed.

## E. *TORTIOUS INTERFERENCE*

Finally, the third cause of action Pelosi asserts in the amended complaint alleges

tortious interference with Pelosi's employment contract against UBS. Specifically, Pelosi asserts that UBS, "without justification procured a material breach of [Pelosi's employment] Contract and/or, alternatively, interfered with Mr. Pelosi's prospective economic advantage." (Compl. ¶ 59.)

Pelosi argues this claim is not preempted by ERISA § 514 because the claim does not relate to ERISA benefits, but to Pelosi's employment contract. A state law "may 'relate to' a benefit plan, and thereby be preempted, even if the law is not specifically designed to affect such plans or the effect is only indirect." *Smith v. Dunham–Bush, Inc.*, 959 F.2d 6, 9 (2d Cir.1992) (internal citations omitted). State laws that are preempted by ERISA include "those that provide an alternative cause of action to employees to collect benefits protected by ERISA...." *Aetna Life Ins. Co. v. Borges*, 869 F.2d 142, 146 (2d Cir.), *cert. denied*, 493 U.S. 811, 110 S.Ct. 57, 107 L.Ed.2d 25 (1989).

Here, the practical operation of Pelosi's tortious interference claim clearly "relates to" the Plan. Pelosi alleges that UBS's "illusory" employment offer resulted in Pelosi's involuntary termination, thereby breaching his employment contract with SCM. If UBS had not extended any job offer at all, however, Pelosi would still have been involuntarily terminated upon the closing of the transaction. The only actual consequence of the alleged interference, and the only injury Pelosi alleges anywhere in the amended complaint, is that the conspiracy which lead to this non-comparable offer deprived him of severance benefits. Thus, but for his right to severance under the ERISA governed Plan, Pelosi would not have a claim for tortious interference. *See Paneccasio v. Unisource Worldwide Inc.*, 2003 WL 1714085, *7 (D.Conn. Mar.28, 2003) (the claim "only arises *because of* the existence of an ERISA plan.") (*citing Hamburger v. Southern New England Telephone Co.*, 1998 WL 241214, at *3 (D.Conn. May 6, 1998) (emphasis in original)).

In order to establish tortious interference under New York [8] law, Pelosi must show: "(1) that a valid contract exists; (2) that a third party had knowledge of the contract; (3) that the third party intentionally and improperly procured the breach of the contract; and, (4) that the breach resulted in damages to the plaintiff." *Albert*, 239 F.3d at 274 (internal citations omitted).

Assuming a valid employment contract existed [9] of which UBS, as a third

**8.** Although the UBS Defendants cite to both New York and New Jersey law in their brief, Pelosi cites only to New York law in support of his tortious interference claim. Neither party raises the correct choice of law to be applied or indicates that there is any substantive difference between New York and New Jersey law. Here, all of the Defendants' principal places of business are in New York and Pelosi resides in New York. However, New Jersey is implicated in that Pelosi's employment was based out of SCM's New Jersey office. As the Court's determination rests primarily on its interpretation of ERISA, not the particulars of the relevant state law, and the requisite elements of the claim under New York and New Jersey law are not substantially different (*compare Albert v. Loksen*, 239 F.3d 256, 274 (2d Cir.2001), *with Pitak v. Bell Atlantic Network Services, Inc.*, 928 F.Supp. 1354, 1369 (D.N.J.1996)), the Court will assume without deciding that New York law applies.

**9.** While the UBS Defendants argue that Pelosi's employment was at-will, and that interference with at-will employment is not actionable, for the purposes of this motion to dismiss, as the Complaint specifically references an employment contract (Compl. ¶ 55), the Court cannot at this point assume Pelosi's employment was at-will.

party,[10] was aware, despite Pelosi's artful pleading, both the alleged intentional breach of that contract and the resulting damages relate to the Plan. As Pelosi's right to employment at SCM was going to end regardless of any interference by UBS, the only "rights and interests under the Contract" (Compl.¶ 58) which UBS appears to have interfered with were Pelosi's rights to severance benefits. Thus, Pelosi's claim necessarily "relates to" rights that arise out of the Plan. *See Valentine v. Carlisle Leasing Int'l Co.*, No. 97 Civ. 1406, 1998 WL 690877, at *5 (N.D.N.Y. Sept. 30, 1998) (finding plaintiff's tortious interference claim preempted as the "claim relates back to the Plan, and the ultimate relief he seeks is recovery of money claimed under the Plan."); *McCauley v. First Unum Life Ins. Co.*, No. 97 Civ. 7662, 1998 WL 846121, at *5 (S.D.N.Y. Dec.2, 1998) (finding tortious interference claim preempted as "it specifically relates and refers to the contractual rights available" under an ERISA governed benefits plan).

Moreover, as the only identified damages to Pelosi that resulted from the alleged interference are the severance benefits Pelosi presumably would otherwise be entitled to under the ERISA governed Plan, Pelosi's claim "relates to" the Plan in order to determine those damages. *See*

*Paneccasio,* 2003 WL 1714085 at *8 (finding tortious interference claim preempted where the claims makes explicit reference to the ERISA plan, concerns plaintiffs receipt of benefits under the plan, and requires reference to the plan to calculate the benefits); *Cerasoli v. Xomed, Inc.,* 952 F.Supp. 152, 157 (W.D.N.Y.1997) ("It is not the label placed on a state law claim that determines whether it is preempted, but whether in essence such a claim is for the recovery of an ERISA plan benefit."). Ultimately, to determine whether there was a breach, and if so, what damages Pelosi suffered, would require the Court "to examine the terms of the ERISA plan and whether [Pelosi] should have been granted [severance] benefits under the ERISA plan." *McCauley,* 1998 WL 846121 at *5.

 Pelosi's tortious interference claim is no more viable if framed as interference with a prospective economic advantage. While the amended complaint references threats that his NASD Form U–5 would indicate that he was terminated for cause if he did not accept the UBSCM offer, the complaint is devoid of any allegations that Pelosi's future employment prospects were in fact negatively affected. Again, the only economic advantage that Pelosi alleges he was specifically deprived

---

**10.** UBS also argues that a tortious interference claim cannot lie against it as UBS was a party to the contract. However, at the time Pelosi alleges the breach occurred, UBS had not yet completed the purchase of SCM. There is an economic interest defense to tortious interference, such that "procuring the breach of a contract in the exercise of equal or superior right is acting with just cause or excuse and is justification for what would otherwise be an actionable wrong." *White Plains Coat & Apron Co., Inc. v. Cintas Corp.,* 460 F.3d 281, 286 (2d Cir.2006) (*citing Foster v. Churchill,* 87 N.Y.2d 744, 642 N.Y.S.2d 583, 665 N.E.2d 153, 153 (N.Y.1996)). However, the Second Circuit has noted that it is

currently unclear what constitutes a sufficient economic interest for the purpose of relying on this defense. *Id.* at 286 (certifying question for New York Court of Appeals). If the alleged breach occurred prior to closing, UBS's economic interest may not be sufficient enough to allow it to rely on this defense. *See New Paradigm Software Corp. v. New Era of Networks, Inc.,* 107 F.Supp.2d 325, (S.D.N.Y. 2000) (where plaintiff alleged interference with contract occurred prior to defendant's stock purchase, the court declined to dismiss tortious interference claim). Since Pelosi's claim is preempted by ERISA, however, the Court need not rule on this issue.

of is his severance benefits under the Plan.[11] Thus, whether framed as interference with an existing contract or with prospective economic advantage, the claim is a disguised attempt to seek recovery of ERISA benefits and is thus preempted.

Consequently, Pelosi's tortious interference claim is dismissed.

### III. *ORDER*

For the foregoing reasons, it is hereby

**ORDERED** that the motion to dismiss (Docket No. 27) of defendants UBS Capital Markets, L.P., formerly known as Schwab Capital Markets, L.P., and UBS Securities LLC is hereby GRANTED; and it is further

**ORDERED** that the motion to dismiss (Docket No. 28) of defendants Charles Schwab Company and the Charles Schwab Severance Plan is GRANTED with respect to the claims of plaintiff Vincent Pelosi ("Pelosi") for discrimination pursuant to ERISA § 510 and for breach of fiduciary duty, and DENIED with respect to Pelosi's claim pursuant to ERISA § 502(a)(1)(B) for denial of benefits.

**SO ORDERED.**

---

**11.** Moreover, interference with future economic advantage, in contrast to interference which leads to an actual breach of an existing contract, requires a showing that the defendant used "improper means or acted solely for the purpose of injuring plaintiff." *Behrend v. Klein,* 2006 WL 2729257, at *11 (E.D.N.Y. Sept.25, 2006); *Carvel Corp. v. Noonan,* 3 N.Y.3d 182, 785 N.Y.S.2d 359, 818 N.E.2d 1100, 1108 (N.Y.2004). UBS cannot be said to have acted by improper means in offering Pelosi a job, and the only improper purpose Pelosi can attribute to UBS is "an incentive to avoid paying Pelosi on comparable terms, in light of his substantial compensation package." (Pelosi Opp. at p. 23). This allegation does not indicate action undertaken solely for the purpose of injuring Pelosi.